**Edward Paul COADY, Petitioner,**

v.

**ASHCRAFT & GEREL, Respondent.**

No. Civ.A. 97–11937–WGY.

United States District Court,
D. Massachusetts.

March 9, 1998.

Patrick T. Jones, Cooley, Manion, Moore &
Jones, P.C., Boston, MA, for Edward Paul
Coady.

Peter A. Biagetti, Mintz, Levin, Cohn, Fer-
ris, Glovsky & Popeo, P.C., Boston, MA,
Stuart H. Newberger, Tara W. Blanchard,

Crowell & Moring, Washington, DC, for Ashcraft & Gerel.

## MEMORANDUM and ORDER

YOUNG, District Judge.

This application, which the petitioner Edward Paul Coady ("Coady") filed originally in the Massachusetts Superior Court sitting in and for the County of Suffolk, seeks an order pursuant to Mass.Gen.Laws ch. 251 directing the parties to proceed to arbitration. The respondent, Ashcroft & Gerel, promptly removed the action to this court on the basis of diversity of citizenship. The matter came before the Court on November 13, 1997, on the motion of Ashcraft & Gerel to dismiss, stay, or transfer venue. After oral argument, this Court ordered the transfer of this action to the United States District Court for the District of Columbia, stating from the bench that it had no discretion in the premises due to the venue provisions of both the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and Mass.Gen.Laws ch. 251.

This pronouncement caught the parties flat footed, as transfer had been urged (and opposed) on other grounds. Ashcraft & Gerel adopted the Court's reasoning at once. Coady promptly moved for reconsideration. After thorough reflection, I find I'm going to have to eat my words.[1]

## BACKGROUND

Ashcraft & Gerel is a law firm with its principal place of business in Washington, D.C. The law firm has several branch offices including one in Boston, Massachusetts. Coady, a resident of Massachusetts, is the managing attorney of Ashcraft & Gerel's law office in Boston. He was hired by the firm in 1989 and has been the managing attorney for at least five years.

In August, 1991, the parties entered into and executed a so-called "Prenuptial Agreement." Def.'s Reply, Ex. A. The purpose of the Prenuptial Agreement is to address the process for Coady's voluntary or involuntary departure from Ashcraft & Gerel, particularly the apportionment of fees generated from Coady's continued representation of former Ashcraft & Gerel clients. The Prenuptial Agreement contains an arbitration provision which states:

11. In the event of any dispute over *the construction, interpretation or application of this Agreement,* the parties agree to binding arbitration under the rules of the American Arbitration Association.

(emphasis added).

On July 29, 1993, Coady and Ashcraft & Gerel entered into and executed a written Employment Agreement. Def.'s Reply, Ex. A. The Employment Agreement contains an arbitration provision which states:

5. It is agreed by the parties that *any ambiguities or questions of interpretation of this contract* shall be the subject of discussions by Coady and a [partners' committee]. . . . Any decision which they may reach in such a matter shall be binding on the partnership. Either party may at this [sic] option elect to submit the matter to Binding arbitration, the reasonable expenses and costs of which will be borne by the loser; however, both parties agree to use reasonable means and good faith to attempt to resolve any differences that may arise prior to resorting to arbitration.

(emphasis added).

On February 26, 1997, Coady sent a letter to Ashcraft & Gerel stating that Ashcraft & Gerel had breached the terms of the Employment Agreement and exercising his alleged option to submit the matter to binding arbitration. In a letter dated March 17, 1997, Coady asserted that Ashcraft & Gerel breached the terms of the Employment Agreement by withholding compensation; by withholding annual and semi-annual earning statements for the Boston office; by hiring a relative of a partner for the Boston office without Coady's approval; and by threats to

---

1. This is hardly the first time this has happened. Indeed, it illustrates as nothing else the value of oral argument. During such an interchange, counsel can articulate their views and can also probe and challenge the Court's reasoning. As Winston Churchill said: "There is no need to be [afraid to eat your words]. I have eaten a great many of mine in my time and on the whole I have found them a most wholesome diet." *Cabral, et al. v. Sullivan, et al.,* 757 F.Supp. 107, 109 n. 3 (quoting from K. Halle ed, The Irrepressible Churchill 145 [1966]).

terminate Coady's employment if he exercised his right to seek arbitration of this employment dispute. Def.'s Reply, Ex. A.

The parties entered into negotiations during April and May, 1997, but without success. Ashcraft & Gerel asserted that Coady had breached the Employment Agreement, claiming Coady used a firm credit card for personal expenses and withheld required information from Ashcraft & Gerel regarding the Boston office. In a letter dated May 27, 1997, Coady accused Ashcraft & Gerel of bad faith in the negotiations and reasserted his intention to exercise the arbitration option, requesting Ashcraft & Gerel to provide an arbitration date. Application, Letter of May 27, 1997, from Patrick T. Jones to Robert G. Samet as Plt's. Ex. E. In response, Ashcraft & Gerel sent a letter the following day stating both its intention to take the matter to arbitration and its desire for written reports from Coady on the Boston office. Plt's. Opp. Mot. Dismiss, Stay, or Transfer Venue Resp., Letter of May 28, 1997, from Robert G. Samet to Edward P. Jones as Plt's. Ex. 2.

On July 15, 1997, Coady sent a letter to Ashcraft & Gerel entitled "Notice of Breach Employment Contract" in which Coady stated that Ashcraft & Gerel's failure to pay the salary bonuses due Coady constituted a breach of the contract and set a cure date of August 15, 1997. Application, Letter from Patrick t. Jones to Allen J. Lowe et al (15 July 1997) as Plt's. Ex. G.

On August 1, 1997, Ashcraft & Gerel filed a complaint for damages and declaratory judgment in the United States District Court for the District of Columbia. ("Ashcraft & Gerel Complaint").[2] In the Ashcraft & Gerel Complaint, Ashcraft & Gerel alleges breach of contract, conversion, and breach of fiduciary duty; and seeks a declaration of enforceability regarding the Prenuptial Agreement, a declaration of termination with cause under the Employment Agreement, and an accounting. Coady was served with the summons and complaint on August 11, 1997.

Shortly thereafter, on August 19, 1997, Coady filed a Verified Application for Arbitration pursuant to Mass.Gen.Laws, ch. 251, § 1 *et seq.* with the Suffolk Superior Court ("Application").[3] Ashcraft & Gerel was served on August 21, 1997. Ashcraft & Gerel filed a Notice of Removal on August 26, 1997, and removed the Massachusetts case to this court. This Court may exercise subject matter jurisdiction over this matter based on diversity of citizenship.

## DISCUSSION

### The Governing Law.

This Court must first determine whether the Massachusetts Uniform Arbitration Act, Mass.Gen.Laws ch. 251, § 1 *et seq.* or the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* applies to this case.

The Federal Arbitration Act is applicable to many proceedings to enforce the arbitration provisions of contracts affecting interstate commerce,[4] but it does not itself create federal question jurisdiction. An independent basis for federal court jurisdiction must also exist in order for the Federal Arbitration Act to apply.[5] The Federal Arbi-

---

2. *Ashcraft & Gerel v. Edward Paul Coady,* Civil Action No. 1:97CV01735 (D.D.C. filed Aug. 1, 1997) (Friedman, J.).

3. With the Application, Coady also filed a Petition for Short Order of Notice and an Ex Parte Motion to Impound Papers. The petition was allowed. Hearing on the Application and the Motion to Impound was set for August 29, 1997.

4. Section 2 of the Federal Arbitration Act states, in pertinent part: A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. 9 U.S.C. § 2.

5. Section Four of the Federal Arbitration Act provides, in pertinent part:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action ... of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.
9 U.S.C. § 4.

tration Act is thus applicable to cases removed from state court to federal court on the basis of diversity jurisdiction where the arbitration provision is part of "a contract evidencing a transaction involving commerce." 9 U.S.C. §§ 2 & 3. *See New England Energy Inc. v. Keystone Shipping Co.*, 855 F.2d 1, 3 (1st Cir.1988). The Supreme Court has interpreted the Federal Arbitration Act to be a rule of substantive law applicable in both federal and state courts to transactions involving interstate commerce, which is "intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements." *Southland Corp. v. Keating*, 465 U.S. 1, 14–16, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984); *see also New England Energy Inc.* at 4. The Federal Arbitration Act, however, specifically excludes from its jurisdiction "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. This employment contract exclusion is not coextensive with the reach of the Act, rather it applies only to employment contracts involving the interstate transportation of *goods*. *See Dickstein v. duPont*, 443 F.2d 783, 785 (1st Cir.1971) (emphasis supplied).

In this case, the Employment Agreement at issue involves a Massachusetts—based lawyer and a Washington, D.C.—based law firm who entered into a contract under which the Massachusetts lawyer agreed to provide and oversee the provision of legal services to clients of the firm involved in asbestos litigation in Massachusetts and Connecticut. Such a contract deals generally with interstate commerce but not the interstate transportation of goods; therefore, the exclusion is inapplicable and the first jurisdictional requirement is met. Diversity of citizenship supplies the second jurisdictional requirement. Accordingly, the Federal Arbitration Act applies here as to any provision inconsistent with the Massachusetts Arbitration Act.

**The Proper Venue.**

Pursuant to section 4 of the Federal Arbitration Act, an application for arbitration may be filed in any federal district court where the jurisdictional requirements are met. The hearing on whether to grant such an application (as well as the arbitration proceeding) "shall be within the district in which the petition for an order directing such arbitration is filed." 9 U.S.C. § 4. Thus, Massachusetts is a proper venue for the determination of arbitrability.

**Ashcraft & Gerel's Motion to Dismiss, Stay, or Transfer Venue.**

■ Having corrected the procedural misstep, the Court returns to the issues raised by Ashcraft & Gerel's Motion to Dismiss, Stay or Transfer Venue. There is no valid basis for the dismissal of this case and Ashcraft & Gerel do not seriously contend otherwise. Nor will this Court stay the Application as such action would defeat one of the federal policy objectives behind the Act: the expeditious resolution of disputes. *See Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 22, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 220, 221, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). Since applications for arbitration are, like any civil case, subject to transfer "to any other district or division where it might have been brought," 28 U.S.C. § 1404(a); *see Cianbro v. Curran–Lavoie, Inc.*, 814 F.2d 7, 11 (1st Cir.1987), the real and only question for decision on this motion is whether transferring this case to the United States District Court for the District of Columbia, where Ashcraft & Gerel filed its complaint for declaratory judgment and damages prior to the filing of this action, would further the interests of justice.

■ The burden of proof upon a motion to transfer venue rests with the party seeking to transfer the action to another jurisdiction. There is a strong presumption in favor of the plaintiff's choice of forum. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). The factors to be considered by a district court regarding a transfer of venue include "the convenience of the parties and witnesses, the order in which jurisdiction was obtained by the district court, the availability of documents and the possibilities of consolidation," *Cianbro*, 814 F.2d at 11, as well as the nexus between the operative facts and the respective forums, trial efficiency, and the forum's famil-

iarity with governing law. *Norwood v. Kirkpatrick*, 349 U.S. 29, 32, 75 S.Ct. 544, 99 L.Ed. 789 (1955) (holding that the relevant factors under the doctrine of forum non conveniens apply to a transfer of venue analysis under 28 U.S.C. § 1404[a] but the discretion to be exercised is broader). The moving party must establish that "the factors in favor of the transfer predominate." *Norman v. Brown, Todd, & Heyburn*, 693 F.Supp. 1259, 1261 (D.Mass.1988) (Skinner, J.).

Paramount among the factors considered in the interests of justice analysis is trial efficiency. This is especially true in the present case.

First, in terms of communications, logistics, and trial preparation, the differences between Boston and Washington are negligible and cannot weigh heavily in the balance. Although the Court addresses the parties' contentions in the footnote below,[7] it is all much ado about nothing.

Second, while both parties here are jockeying for home court advantage, their machinations bring little credit to the legal profession and are entitled to no weight. It is especially troubling to note that Ashcraft & Gerel appear to have drifted along with Coady toward arbitration and then, when negotiations foundered, immediately filed their contract action in Washington. *See Lexington Ins. Co. v. City of Phoenix*, 1996 WL 463672 (D.Mass.1996).[8]

---

**7.** *Convenience of the Parties*

It does not appear that the convenience of the parties will be enhanced if this case is transferred to the District of Columbia. While litigation in the District of Columbia would be more convenient to Ashcraft & Gerel, a firm whose headquarters are located in the District of Columbia, and many of whose partners reside in the Washington, D.C. metropolitan area, transfer would be equally burdensome to Coady, a Massachusetts resident. Thus, transfer would serve merely to shift the inconvenience from the defendants to the plaintiff. *See Berrigan v. Greyhound Lines, Inc.*, 560 F.Supp. 165, 169 (D.Mass.1982), aff'd. 782 F.2d 295 (1st Cir.1986).

*Witnesses*

A mere statement of convenience or a claim that the greatest number of witnesses reside in a particular forum is insufficient. The number of witnesses is not determinative. The critical factor is the content of the witness testimony. "The party seeking the transfer must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover. The emphasis must be on this showing rather than on numbers." Wright, Miller & Cooper, 15 *Federal Practice and Procedure* § 3851 at 425 (2d 1986).

Neither party has submitted a list of witnesses with a general statement regarding expected testimony. Ashcraft & Gerel puts forth as witnesses the partners who are allegedly located in the District of Columbia metropolitan area. Ashcraft & Gerel asserts that the only witness located in Massachusetts is Coady. Coady, on the other hand, states that his witnesses will be current and former employees of Ashcraft & Gerel's Boston office who are allegedly all residents of Massachusetts. Without more detail, this Court must speculate about the substantive witness testimony that would be hampered depending on the forum. As Ashcraft & Gerel's witnesses may be best able (or inclined) to be available to testify regardless of the place of hearing given their partnership interest in Ashcraft & Gerel, this factor does not tilt decidedly in their favor.

*Availability of Documents*

The moving party must show the location and the importance of documents in question. Ashcraft & Gerel claim that "most of the documents at issue, including relevant correspondence and a large Massachusetts client and case database" are located in Washington, D.C. On the other hand, Coady asserts that "the overwhelming majority of documentation" relevant to the claims of each party are contained in the case, account, and expense files of the Boston office. Both sides assertions regarding the relevant documents lack the specificity necessary fully to ascertain the character and quantity of such documents. Nevertheless, this factor is not given tremendous weight in this Court's assessment as documents are easily transported or reproduced.

*Nexus Between the Dispute and the Respective Fori*

As both sides acknowledge, any conduct by Coady that is the basis of the Ashcraft & Gerel Complaint took place in Massachusetts. Thus, there is a direct nexus between the dispute and Massachusetts. A nexus does exist between some of the operative facts and the District of Columbia as the financial and reputational implications of Coady's conduct arguably affect Ashcraft & Gerel, a firm with headquarters in Washington, D.C. This, however, is a more tenuous nexus than the Massachusetts one.

**8.** In this case, Ashcraft & Gerel's assertion that Coady's Application should be transferred pursuant to the doctrine of the "first to file" rule rings especially hollow. This is the rule that states "where identical actions are proceeding concurrently in two federal courts, entailing duplicative litigation and a waste of judicial resources, the first filed action is generally preferred in a choice-of-venue decision." *Cianbro*, 814 F.2d at 11. Actions are identical where they involve the same parties and the same issues or the same transaction. *See, e.g., Norman*, 693 F.Supp. at

While American culture may be a triumph of homogeneity, her federal courts functioning under laws uniform throughout the land, attorneys nonetheless almost invariably seek to argue their clients' cause before local judges and juries. Forum shopping is an inevitable concomitant of our adversary system, *see Hanna v. Plumer*, 380 U.S. 460, 469–78, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); *see also M/S Bremen v. Zapata Off-Shore*

1261. Of course, "while the first-filed rule ordinarily may be a prudent one, it is so only because it is sometimes more important that there be a rule than that the rule be particularly sound." *Codex Corp. v. Milgo Electronic Corp.*, 553 F.2d 735, 737 (1st Cir.1977), *cert. denied*, 434 U.S. 860, 98 S.Ct. 185, 54 L.Ed.2d 133 (1977).

The parties in the two federal court proceedings, in this case, are the same. In Ashcraft & Gerel's Complaint, the issues concern Coady's conduct as the managing partner of the Boston office. In the Application, the issues concern the compliance of Ashcraft & Gerel and Coady with the terms of the Employment Agreement which delineate Coady's responsibilities as the managing partner and his relationship to Ashcraft & Gerel. Thus, the issues are the same or arise out of the same transaction—Coady's employment with Ashcraft & Gerel.

Although the actions are identical in terms of the parties and the issues, the usual concerns regarding duplicative litigation and the waste of judicial resources are not present. First, entry of an order to compel arbitration where one party has failed or refused to adhere to an agreement to arbitrate does not implicate substantial litigation resources. Instead, it requires a court expeditiously to make two determinations: 1) Is there an agreement to arbitrate? 2) Are the matters at issue subject to this agreement? If so, the court must order the parties to arbitrate those issues. If not, it must dismiss the application. This process moves arbitrable issues out of the judicial forum and into arbitration more swiftly than litigation. No judicial resources are used in the arbitration, and the outcome of the arbitration may resolve, or at least narrow, the issues in the District of Columbia litigation. Second, while two lawsuits may occur simultaneously resulting in the duplication of evidence and litigation and the possibility of conflicting or contradictory results, the arbitration process can be inserted ahead of litigation. The Federal Arbitration Act commands the staying of any suit or proceeding dealing with any issue subject to arbitration thereby avoiding the issue of duplication.

The Federal Arbitration Act states, in pertinent part:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, **shall on application of one of the parties** stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the appli-

cant for the stay is not in default in proceeding with such arbitration.
9 U.S.C. § 3. (emphasis added)

Moreover, given the facts of this case, strict adherence to the first-filed rule, a judicially-created doctrine, would not be appropriate. Here the parties commenced negotiations regarding the issues in dispute at least five months before Coady, consistent with the Employment Agreement, served Ashcraft & Gerel with a Notice of Breach of the Employment Agreement dated July 15, 1997. In fact, in a letter to Coady's counsel dated May 28, 1997, Ashcraft & Gerel affirmatively stated its intent to arbitrate.

This letter stated, in relevant part:

As to arbitration, first let me note that your claim that we have been refusing to provide you with a date to arbitrate is ridiculous. We have never refused to provide you with a date to arbitrate. We have simply made an effort, as required under the [Employment] agreement, to resolve this matter. It is our intention to take this matter to arbitration in the Washington, D.C. metropolitan area over Mr. Coady's breach of fiduciary duties ... as well as his breach of the written agreement between us. We intend to promptly seek legal counsel to represent us and will, at that time, with Mr. Coady's cooperation, select the arbitrator. If Mr. Coady has some issues he would like to present at the arbitration, he is certainly entitled to do so....

Letter of May 28, 1997, from Robert G. Samet, Esq. to Edward P. Jones, Esq.

An order to compel arbitration cannot be sought unless there is "an alleged failure, neglect or refusal of another to arbitrate," 9 U.S.C. § 4. Until Ashcraft & Gerel filed and served its Complaint, the record shows no sufficient basis upon which Coady could have established this essential element of a cause of action under the Federal Arbitration Act. Coady, initially, filed his Application under the Massachusetts Uniform Arbitration Act. Mass.Gen.Laws ch. 251, § 1 *et seq.* This statute, like the Federal Arbitration Act, permits a party to seek an order compelling arbitration where another party has failed or refused to arbitrate. Mass.Gen.Laws ch. 251, § 2(a). Prior to the filing and service of the Complaint, Coady had no indication that Ashcraft & Gerel was refusing to arbitrate and, therefore, no basis to seek an order to arbitrate. As the Act has a general venue provision, it would seem against the interests of justice—and counter to the intent of Congress—to allow a party to dictate the forum for arbitration by taking no action sufficient to constitute failure or refusal before filing related litigation in its preferred forum. Thus, this Court rules the first-filed rule inapposite to this situation.

Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (contractual choice-of-forum clauses proper and enforceable), and it is generally recognized that the litigant who is winkled out of his chosen forum is significantly weakened. *See* Proceedings of the Second Annual Drug and Medical Device Litigation Conference, American Conference Institute, New York, December 8, 1997 (presentation of Donald F. Zimmer, Jr., "How to Avoid, Control or Limit Depositions of Top Executives," and audience response).

Courts, of course, make choice-of-forum decisions on neutral principles, seeking to remain above this unseemly scramble. And what more neutral approach than, with due regard for the rights of the parties, to chose from among the venues available that court which can best provide the "speedy, efficient, and just" resolution of the dispute promised by the first Federal Rule of Civil Procedure? In fact, this is precisely what federal courts do routinely, allocating judicial business wherever possible to those courts with the presently-available judicial resources to handle it.

Sadly, however, today federal courts are far from equal in this regard. As Chief Justice Rehnquist has pointedly remarked:

> [J]udicial vacancies aggravate the problem of too few judges and too much work. Currently, 82 of the 846 Article III judicial offices in the federal judiciary—almost one out of every ten—are vacant. Twenty-six of the vacancies have been in existence for 18 months or longer and on that basis constitute what are called "judicial emergencies." . . . .
>
> Judicial vacancies can contribute to a backlog of cases, undue delays in civil cases, and stopgap measures to shift judicial personnel where they are most needed. Vacancies cannot remain at such high levels indefinitely without eroding the quality of justice that traditionally has been associated with the federal judiciary . . . .

The institutions that have the constitutionally assigned powers of nominating and confirming judicial nominees bear some of the responsibility for the current situation, but structural aspects of the appointment process also contribute to the existing high level of vacancies. For example, a larger judiciary increases the average number of retirements per year and the corresponding number of nominees. The additional burdens placed on the appointment process by such an increase may slow it down. An appointment process that might work well to fill the vacancies of a 700–member judiciary might struggle with a judiciary of 800 or 850 members. Accordingly, increasing the size of the federal judiciary so that it can handle expanded workloads might have the unintended effect of increasing the vacancy rate, perhaps leaving unaffected the gap between resources and workload that motivated the initial increase in the number of judges. This ironic result strongly supports the common-sense conclusion that, in this country, a bigger federal judiciary is not necessarily a part of a solution for every public-policy question.

Whatever the size of the federal judiciary, the President should nominate candidates with reasonable promptness, and the Senate should act within a reasonable time to confirm or reject them. Some current nominees have been waiting a considerable time for a Senate Judiciary committee vote or a final floor vote. The Senate confirmed only 17 judges in 1996 and 36 in 1997, well under the 101 judges it confirmed during 1994.

The Senate is, of course, very much a part of the appointment process for any Article III judge. One nominated by the president is not "appointed" until confirmed by the Senate. The Senate is surely under no obligation to confirm any particular nominee, but after the necessary time for inquiry it should vote him up or vote him down. In the latter case, the President can then send up another nominee.

Hon. William H. Rehnquist, Chief Justice of the United States, The 1997 Year-end Report on the Federal Judiciary at 7–9, January 1, 1998.[9]

---

9. The Senate has confirmed five Article III judges since the beginning of the year: Ann L.

This case is a perfect example of the practical consequences of the Chief Justice's concern. While the District of Massachusetts presently enjoys its full complement of district judges and magistrate judges, the United States District Court for the District of Columbia is in a state of "judicial emergency." It has two judicial vacancies unfilled, one since February, 1996, and the other since January, 1997. The absence of adequate judicial resources is felt in a myriad of ways. Litigants wait longer to have their cases heard; moreover, cases in the pipeline do not simply sit, they churn—and the churning draws scarce judicial resources away from the courts' core function—promptly trying the litigants' cases to a just resolution. Unfilled judicial vacancies thus necessitate spreading an over-growing caseload upon judges already burdened, requiring them to reorder their priorities in order to manage these new and reassigned cases. It should come as no surprise, then, that the most recent statistics show that a district judge in Washington was able to try only 16 cases to completion in 1996 while, in the same time period, her counterpart in Massachusetts was able to try 26 cases. 1996 Federal Court Management Statistics, Administrative Office of the United States District Courts at 33, 38.

Nor is the District of Columbia District Court the only district court presently enduring a judicial emergency. As of this writing, there are comparable emergencies in the following district courts:

### Judicial Emergencies
(Vacancies in existence for 18 months or longer)
As of 1/1/98

| Circuit | Court/ Vacancy Created by | Reason | Vacancy Date | Days Pending |
|---|---|---|---|---|
| First | District of Puerto Rico | | | |
| | Acosta, Raymond L. | Senior | 6/1/94 | 1314 |
| Second | Northern District of New York | | | |
| | Cholakis, Con. G. | Disabled | 10/23/92 | 1900 |
| Third | Eastern District of Pennsylvania | | | |
| | O'Neill, Thomas N., Jr. | Senior | 7/6/96 | 548 |
| | Middle District of Pennsylvania | | | |
| | Caldwell, William W. | Senior | 5/31/94 | 1315 |
| | Western District of Pennsylvania | | | |
| | Cohill, Maurice B., Jr. | Senior | 11/28/94 | 1134 |

Aiken to the District of Oregon, Richard W. Story to the Northern District of Georgia, and Barry L. Silverman to the Ninth Circuit, 144 Cong.Rec. 585-05 (daily ed. Jan. 28, 1998), Carlos R. Moreno to the Central District of California, 144 Cong.Rec. 5292-02 (daily ed. Feb. 3, 1998), and Margaret M. Morrow to the Central District of California, 144 Cong.Rec. 5640-01 (daily ed. Feb. 11, 1998). In addition, the Senate confirmed the renomination of Judge Christine O.C. Miller to another term on the Court of Federal Claims. 144 Cong.Rec. 5292-02 (daily ed. Feb. 3, 1998).

| | | | | |
|---|---|---|---|---|
| **Fifth** | **Northern District of Texas** | | | |
| | Public Law 101–650 | New Position | 12/1/90 | 2592 |
| | Sanders, Barefoot | Senior | 1/1/96 | 735 |
| | **Southern District of Texas** | | | |
| | Public Law 101–650 | New Position | 12/1/90 | 2592 |
| **Sixth** | **Northern District of Ohio** | | | |
| | Dowd, David D., Jr. | Senior | 6/30/96 | 554 |
| **Seventh** | **Central District of Illinois** | | | |
| | Baker, Harold Albert | Senior | 10/4/94 | 1189 |
| | **Northern District of Illinois** | | | |
| | Hart, William | Senior | 6/1/96 | 583 |
| | **Southern District of Illinois** | | | |
| | Beatty, William L. | Senior | 11/9/92 | 1883 |
| **Ninth** | **Northern District of California** | | | |
| | Aguilar, Robert P. | Senior | 6/24/96 | 560 |
| | **Southern District of California** | | | |
| | Rhoades, John S., Sr. | Senior | 11/4/95 | 793 |
| | **District of Hawaii** | | | |
| | Fong, Harold M. | Deceased | 4/20/95 | 991 |
| | **District of Oregon** | | | |
| | Frye, Helen | Senior | 12/10/95 | 757 |
| **Eleventh** | **Northern District of Alabama** | | | |
| | Hancock, James H. | Senior | 5/1/96 | 614 |
| **District of Columbia** | **District of Columbia District Court** | | | |
| | Harris, Stanley S. | Senior | 2/1/96 | 704 |

**Total Judicial Emergencies: 17**

Source: Administrative Office of the United

States Courts [10]

The simple fact is that the judges of the United States know, or can readily ascertain, which courts are overburdened, swamped with drug cases or grievously lacking in necessary judicial resources. Judges are properly hesitant to transfer civil cases into those courts and the judges serving there are, equally properly, quick to transfer such cases out. While this is neutral justice, it has the practical—and very real—effect of reducing the chance that the citizens of Alabama, California, Hawaii, Illinois, New York, Ohio, Oregon, Pennsylvania, Puerto Rico, Texas, and the District of Columbia will have access to their federal courts equal to that enjoyed by those areas of the country where adequate judicial resources have been secured by the people's elected representatives.[11] So it is here. For all of the reasons canvassed and weighed above—but primarily due to the existence of a judicial emergency in the United States District Court for the District of Columbia—this Court respectfully declines to transfer the arbitrability decision to that court.

**Coady's Application for Arbitration.**

Having retained jurisdiction, it is this Court's duty promptly to decide the arbitrability issue. As the parties were instructed by this Court's order dated September 9, 1997, that the issue of arbitrability would be heard along with Ashcraft & Gerel's Motion to Dismiss, Stay, or Transfer Venue and the matter has been fully briefed, this Court rules on Coady's Application without further hearing.

Coady seeks an order compelling arbitration as to "all of the matters in dispute between them." In order for this Court to enter such an order, it must determine that each matter in dispute is subject to the applicable arbitration clause. A review of the record before this Court identifies the following areas of dispute:

1. Bonus Payment to Coady for the first half of 1997 pursuant to the Employment Agreement;

2. Hiring of personnel for the Boston office;

3. Withholding of semi-annual and annual earning statements of the Boston office by Ashcraft & Gerel from Coady;

4. Improper threats of termination by Ashcraft & Gerel if Coady exercised his right of arbitration;

5. Improper use of company credit cards by Coady (conversion);

6. Failure by Coady to provide Ashcraft & Gerel with required financial documents regarding the Boston office (breach of fiduciary duty/accounting);

7. Failure by Coady to perform properly his managerial duties, obligations, and responsibilities;

8. Breach of fiduciary duty by Coady;

9. Enforceability and validity of the Prenuptial Agreement.[12]

---

**10.** The situation actually is more serious than reported in the text since, as of January 1, 1998, there were an additional 9 vacancies unfilled for more than 18 months in the various circuit courts of appeal. As of the beginning of this year, there were 86 judicial vacancies with 41 Presidential nominations pending.

**11.** It is interesting to note that the burden of inadequate judicial resources appears to fall disproportionately on our largest and most populous states. Perhaps this reflects the fact that these states enjoy less relative influence in the Senate, where every state is represented equally.

**12.** In its Complaint filed with the United States District Court for the District of Columbia, Ashcraft & Gerel aver as follows:

Beginning in approximately December, 1996, Defendant began engaging in the following activities:

a. Intentionally failing and refusing to record the names and addresses of persons who became or sought to become clients of Plaintiff in its Boston office;

b. Failing to provide timely and accurate financial, business and professional information concerning the Boston office;

c. Failing and intentionally refusing to accept and cooperate with the directions of Plaintiff concerning the management of the Boston office, including refusal to permit a lawyer hired by the Plaintiff to practice law in its Boston office to work there and refusal to seek proper authorization for the purchase of goods and services for the Boston office.

d. Misusing and misappropriating Plaintiff's assets by, among other things, charging to a credit card issued in the name of the Plaintiff expenses that were not for the benefit of Plaintiff including, (on informa-

### 1. *Standard for Determining Arbitrability*

▮▮▮▮ Whether there is an agreement to arbitrate is a question of law for this Court to decide using general principles of contract law. Arbitration agreements are to be construed according to the general rules governing the interpretation of contracts, taking into account the intention of the parties and the strong public policy in favor of arbitration. *See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth*, 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hos.*, 460 U.S. at 24–25.

### 2. *Language of the Agreements*

#### a. Employment Agreement

▮▮▮ This arbitration provision is not a standard broad arbitration clause applying to any dispute between Coady and Ashcraft & Gerel arising out of or relating to the Employment Agreement. Instead, this Court reads this arbitration clause to define a limited scope of arbitration. Under the Employment Agreement, the parties have agreed to arbitrate disputes (1) requiring clarification of the meaning of a particular contractual provision because the language of the contract suggests more than one reasonable interpretation (ambiguities) and (2) requiring construction of the substantive provisions of the contract. Once the arbitrator determines the meaning of a contractual provision, the role of the arbitrator is complete. Unless the parties mutually agree to continue arbitration for the purpose of complete resolution of a dispute, the dispute must be resolved through litigation, or private settlement.[13]

▮▮▮ The location of this arbitration provision implies a further narrowing of the scope of arbitration. This provision is part of the Financial section of the Employment Agreement which deals with compensation. There is no separate section regarding arbitration, dispute resolution, or grievances. The location of the provision suggests that only issues relating to compensation are the subject of arbitration. On the other hand, the use of the phrase "this contract" implies a broader application of the clause. "[I]f the contract language chosen by the parties is unclear as to the nature of the claims to which an agreement to arbitrate extends, a 'healthy regard' for the federal policy favoring arbitration requires that 'any doubts concerning the scope of an arbitrable issue be resolved in favor of arbitration.'" *McCarthy v. Azure*, 22 F.3d 351, 355 (1st Cir.1994) (quoting *Moses H. Cone Mem. Hos.*, 460 U.S. at 24–25). Bearing this principle in mind, this Court concludes that whether the arbitration clause applies to issues other than those encompassed in the Financial section is an ambiguity which is the proper subject for arbitration. *See Volt Information Sciences, Inc. v. Board of Trustees of the Leland Stanford Junior University*, 489 U.S. 468, 475, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). If the arbitrator concludes it applies only to the Financial section, then only the dispute regarding the payment of Coady's bonus, as discussed herein, is arbitrable. If the arbitrator concludes this clause applies to the entire Employment Agreement, then this Court's further discussion on arbitrability shall direct the arbitrator, see *infra* 22–25.

#### b. Prenuptial Agreement

This arbitration provision is slightly broader than the arbitration clause of the Employment Agreement as it subjects to arbitration not simply the process of discovering and ascertaining the meaning of the contract but also applying the terms of the Agreement to a specific set of facts.

tion and belief), but not limited to, travel expenses, gifts, and dining.
Complaint ¶ 15.

**13.** The result of this arbitration clause is to segment the dispute between the parties, potentially prolonging rather than expediting the resolution of any dispute. Such a result is counter to the basic goal of the arbitration process. Despite this potentially inefficient effect, this Court is required to enforce the agreement to arbitrate "even if the result is piecemeal litigation." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985).

Having ascertained the scope of these arbitration clauses, this Court turns to the question of arbitrability of each disputed issue.

### 3. *Arbitrability of the issues Concerning the Employment Agreement*

#### a. Breach of the Employment Agreement

##### 1) *Breach of the Employment Agreement by Coady*

 Whether Coady's conduct constitutes "a failure to live up to a material term of the [employment] agreement" thereby permitting Ashcraft & Gerel to terminate with cause and avoid the payment of any liquidated damages, as provided in the Employment Agreement, requires an interpretation of duties, obligations, and responsibilities of Coady as an employee and managing partner. Contrary to the assertions of Ashcraft & Gerel in their brief, the Employment Agreement does not specifically delineate these duties, obligations, and responsibilities. It contains only a general description of them. This generality necessitates the interpretation of the contract to ascertain Coady's exact duties, obligations, and responsibilities. This inquiry is subject to arbitration.

##### 2) *Breach of the Employment Agreement by Ashcraft & Gerel*

###### a) *Payment of Coady's Bi-annual Bonus*

 By the express terms of the Employment Agreement, Coady is entitled to a bi-annual bonus equal to twenty-five percent of the net profits of the Boston office. Amendment to Employment Agreement dated 29 July 1993. This bonus payment is capped; Coady's total annual compensation cannot exceed a senior partner's draw for the same calendar year. *Id.* Coady asserts that Ashcraft & Gerel has failed to make this bonus payment for the first half of 1997. *See* Notice of Breach of Employment Contract dated 15 July 1997. The calculation of the bonus is the subject of arbitration as the determination of net profit requires interpretation of whether certain expenses are "related." However, the obligation to make this payment is not the subject of arbitration, as there is no ambiguity in the Employment Agreement regarding Ashcraft & Gerel's duty, to make this bonus payment.

###### b) *Failure to Disclose Annual and Semi-annual Earning Statements*

 In the Financial section of the Employment Agreement at paragraph four, it states that "Quarterly (if available,) Semi–Annual Reports and Annual Reports and accounting shall be provided by the firm to Coady with respect to the Boston operations." This provision establishes an affirmative duty on the part of Ashcraft & Gerel to provide Coady with semi-annual and annual earning statements. Oddly, this provision is part of a paragraph primarily dealing with the process for resolving disputes over the calculation of Coady's bi-annual bonus. Nevertheless, it is clear that such a duty of disclosure does exists presenting only the question of whether this duty is a material term of the Agreement. Whether a party's particular conduct constitutes a material breach of contractual provisions is a question of fact, determined under the specific circumstances of the case. *See, e.g., O'Connell Management Co., Inc. v. Carlyle–XIII Managers, Inc.,* 765 F.Supp. 779, 783 (D.Mass. 1991) (citing *Cetrone v. Paul Livoli, Inc.,* 337 Mass. 607, 610, 150 N.E.2d 732 [1958]; *Lander v. Samuel Heller Leather Co.,* 314 Mass. 592, 595–96, 50 N.E.2d 962 [1943]; *Glines v. Berry Box & Package Co.,* 248 Mass. 518, 523, 143 N.E. 344, [1924]; *Charles River Constr. Co. v. Kirksey,* 20 Mass.App.Ct. 333, 339–40 & n. 6, 480 N.E.2d 315, [1985]); *see also* E. Farnsworth, Contracts § 8.16 (1990). No interpretation of any provision of the Employment Agreement is required and therefore this aspect of the matter is outside of the scope of the arbitration clause of the Employment Agreement.

###### c) *Hiring of Boston Office Personnel*

 There is ambiguity in the Employment Agreement regarding the role of Coady in the hiring of Boston office personnel. The Employment Agreement contains a section entitled "Management of the Boston Office" that states, in pertinent part: "It is agreed that the office shall, under the terms of this agreement, be *essentially managed as before*

by Coady subject to oversight and review by the partners." (emphasis added). Whether the "essentially managed as before" clause means that Coady has a role in the hiring of employees for the Boston office is a question of interpretation as is the scope of Coady's role. This issue is within the arbitration clause.

### d) *Threats of Termination for Exercising Right of Arbitration*

 The alleged threat by a partner of Ashcraft & Gerel to fire Coady if he exercised his right of arbitration under the Employment Agreement does not relate to the interpretation of any provision of the Employment Agreement. Thus, it is outside the scope of the arbitration clause.

### b. Conversion

 Ashcraft & Gerel aver that Coady's use of a company credit card for travel expenses, gifts, and dining not related to or for the benefit of the business of Ashcraft & Gerel constituted conversion. Complaint ¶ 15(d). Conversion is the wrongful possession or control over the property of another. Therefore, whether the control exercised by Coady was outside of the scope of the authorized use of the company credit card requires determining the scope of authorized use. This determination in turn requires at least an interpretation of whether such expenses are within the scope of the expense provision entitled "Advertising, Travel, Entertainment" in the Duties section of the Employment Agreement. Thus, the issue of wrongful possession is subject to arbitration.

### C. Breach of Fiduciary Duty

 The breach of fiduciary duty issue is not subject to arbitration. The agency relationship between Coady and Ashcraft & Gerel is established by the Employment Agreement. An agent is a fiduciary with respect to matters within the scope of his agency. Restatement (Second) of Agency § 13 (1984). Although the duties of Coady as an agent may present questions of interpretation of the Employment Agreement, fiduciary duties arise out of agency law and do not depend on

any interpretation of the Employment Agreement.

### 4. *Arbitrability of the Prenuptial Agreement*

 In the Ashcraft & Gerel Complaint, Ashcraft & Gerel seek a declaration that "the Prenuptial Agreement is valid and enforceable as against [Coady] in respect of its allocation formula for fees earned by [Coady] after his departure from [Ashcraft & Gerel's] employment." Complaint ¶ 23. Ashcraft & Gerel alleged that Coady "does not consider the Prenuptial Agreement enforceable as against him, and that he will not honor it if he should leave the firm's employment." *Id.* ¶ 17. These allegations raise a question of the existence of a contract, not its meaning or application, and therefore the issue of the validity and the enforceability of the Prenuptial Agreement falls outside of the scope of the arbitration clause.

### CONCLUSION

As discussed herein, the Court rules that the arbitration clauses in the Employment Agreement and the Prenuptial Agreement compel arbitration of the following issues:

1. What are the duties, obligations, and responsibilities of Coady under the terms of the Employment Agreement?

2. What are the related expenses for determining the Boston office's net profits?

3. What is the meaning of the provision: "It is agreed that the office shall, under the terms of this agreement, be essentially managed as before Coady subject to oversight and review by the partners"?

4. What is the scope of Coady's authorized use of the company credit card?

Thus, Coady's Application is **GRANTED IN PART** and **DENIED IN PART**. Ashcraft & Gerel is ordered to arbitration on the above-stated issues. As the Employment Agreement does not contain a forum-selection provision, this arbitration is to take place in Massachusetts pursuant to the venue re-

**110**

quirement of section 4 of the Federal Arbitration Act.[14]

The potential issue of a stay or partial stay of the District of Columbia action must be presented to that court. *See* 9 U.S.C. § 3.

This Court shall retain jurisdiction to insure that arbitration proceeds and is confirmed in accordance with this order. *See Corion Corp. v. Chen,* No. 91–11792–Y, 1991 WL 280288, at *9 (D.Mass. Dec.27, 1991). Pending such application for confirmation or a motion for some interim order, this case shall be administratively closed.

**14.** Section 4 of the Federal Arbitration Act states, in pertinent part, that "[t]he hearings and proceedings, under [the written agreement for arbitration], shall be within the district in which the petition for an order directing such arbitration is filed." 9 U.S.C. § 4.