801 A.2d 1104

**THE REDEMPTORISTS,**

v.

**COULTHARD SERVICES, INC., et al.**

**No. 0774, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

June 28, 2002.

120

John M. Seeberger, Baltimore, for appellant.

Herbert H. Miller, Towson, for appellees, Coulthard Services, Inc. and Thomas J. Coulthard.

James M. Timmerman (Miles & Stockbridge, P.C., on the brief), Towson, for appellee, Dorman.

Argued before SONNER, ADKINS, and KRAUSER, JJ.

ADKINS, Judge.

In this appeal we are asked to define the scope and effect of a narrowly drafted arbitration provision on a dispute involving multiple overlapping issues, and multiple parties, some of whom are not parties to the agreement to arbitrate. We resolve the appeal by ascertaining that the parties intended to arbitrate only one issue, but recognizing the res judicata effect that arbitration of that issue may have on the overlapping non-arbitrable issues. The issues as to the non-contracting parties should be stayed pending the outcome of the arbitration.

The arbitration clause in question was contained in a contract between The Redemptorists, appellant, and Coulthard Services, Inc. ("CSI"), appellee, regarding CSI's provision of cemetery services to cemeteries owned and operated by The Redemptorists. The latter brought suit in the Circuit Court for Baltimore County against CSI, and two of its principals, appellees Thomas Coulthard and Lee Dorman.

CSI and Coulthard filed a petition to compel arbitration under the arbitration provision in the contract.[1] The court granted the petition as to both CSI and Coulthard, ordering that The Redemptorists' claims against these two parties be arbitrated. The court also stayed The Redemptorists' claims against Dorman until the conclusion of the arbitration.

---

1. Dorman did not file such a petition, and thus the court did not rule on the arbitrability of the claims against him.

The following issues are raised in this appeal of the lower court's decision:

I. Should this Court grant CSI and Coulthard's motion to dismiss this appeal as not properly before the Court?

II. Did the trial court err in granting Coulthard's petition to order arbitration when Coulthard, individually, was not a party to the contract between CSI and appellant that contained the arbitration provision?

III. Did the trial court err in finding that CSI and Coulthard had not waived their rights to arbitration?

IV. Did the trial court err in granting CSI and Coulthard's petition to order arbitration of all of the claims raised in appellant's amended complaint?

V. Did the trial court err in staying the court action as to any non-arbitrable claims, including the claims against Dorman?

Finding this appeal properly before us, we deny CSI and Coulthard's motion to dismiss the appeal. In addressing the merits of the appeal, we hold that the court erred in granting appellant Coulthard's petition to arbitrate because Coulthard was not a party to the contract containing the arbitration provision. We further hold that the trial court correctly concluded that CSI had not waived its right to arbitrate the claims against it.

We find error, however, in the trial court's determination that all of The Redemptorists' claims against CSI were arbitrable. Accordingly, we reverse the judgment in part. Because The Redemptorists' challenge to the stay of the claims against Dorman is not properly before us, we will not address it.

## FACTS AND LEGAL PROCEEDINGS

The Redemptorists is a Maryland corporation with its principal office in Baltimore. The corporation is "a congregation of priests and religious [persons]" that owns and operates several cemeteries in Baltimore City, and Baltimore and Anne

Arundel Counties. CSI is a Maryland corporation providing various cemetery services. Thomas Coulthard is CSI's President, while Lee Dorman is a CSI officer.[2]

The Redemptorists and CSI entered into a contract in 1990, whereby The Redemptorists granted CSI the "right to sell cemetery lots, monuments, markers, mausoleums, crypts, pre-need burial contracts, including vaults and liners" on the grounds of two cemeteries owned by The Redemptorists. In return, CSI agreed to pay The Redemptorists a certain percentage of the "gross sales price" of its products and services pertaining to these cemeteries. This payment was to be made on a quarterly basis. The contract term was amended in 1993 to bind the parties through August of 2000. The 1993 extension contract also provided that CSI would build mausoleum buildings at one of the cemeteries, at its own expense, and then turn the fee simple title of such buildings over to The Redemptorists. The Redemptorists would receive a certain percentage of the sales price of crypts in the mausoleum buildings. The 1993 contract incorporated all the provisions of the 1990 contract.

Under a section entitled "Grounds For Termination," the 1990 contract granted CSI the right to arbitrate certain disputes.

*GROUNDS FOR TERMINATION.* Anything herein to the contrary notwithstanding, the Redemptorists shall have the right to terminate this Agreement for **"cause"** which **shall be defined as including any of the following specific grounds**:

a. The refusal on the part of CSI to perform its duties under this Agreement after first having been given thirty (30) days prior written notice by the Redemptorists demanding such performance.

b. Personal gross misconduct on the part of the principals of CSI that is deemed to have a material adverse effect

---

**2.** For purposes of this appeal, we assume the accuracy of the background facts set forth in The Redemptorists' complaint, indicating Dorman's status.

on the reputation and integrity of the Redemptorists, Sacred Heart of Jesus Cemetery or Most Holy Redeemer Cemetery . . . .

c. A material breach of this Agreement which shall include the failure of CSI for any reason, within thirty (30) days after receipt of written notice from the Redemptorists to correct, cease, or otherwise alter any insubordination, failure to comply with instructions, or other action or omission to act that in the opinion of the Redemptorists does or may materially or adversely affect its ownership and operation of its cemeteries.

d. The bankruptcy or insolvency of CSI.

**In the event CSI disputes the cause associated with any such discharge, then the parties agree to submit such dispute to binding arbitration** in Baltimore, Maryland, pursuant to the provisions of the Maryland Uniform Arbitration Act as set forth in the Courts & Judicial Proceedings Article of the Annotated Code of Maryland. (Emphasis added.)

All went smoothly under the contract until, in early 1999, The Redemptorists requested to review CSI's records and accounts related to the cemetery properties. Through this review, The Redemptorists allegedly discovered that CSI owed it $800,000, which it had not remitted as required under the terms of the contract. Thereafter, The Redemptorists sent a letter to CSI, giving it 30 days to cure the breach, *i.e.*, to pay the sum allegedly owed. When this 30 day period lapsed, The Redemptorists terminated its contract with CSI under the "Grounds For Termination" provision set forth above.

On February 14, 2000, The Redemptorists filed a complaint against CSI alleging breach of contract and conversion. Based on this complaint, CSI filed a motion for a more definite statement and a motion to dismiss for lack of jurisdiction. While CSI's motions were still pending, The Redemptorists filed a First Amended Complaint ("the complaint") on July 17, 2000, in the Circuit Court for Baltimore County. The amend-

ed complaint added Thomas Coulthard and Lee Dorman, two of CSI's principals, as defendants, and alleged six separate counts rather than the two featured in the original complaint.

**COUNT I** alleged **breach of contract** against **CSI.**

**COUNT II** alleged **fraud** against **CSI and Coulthard** for misrepresenting "a) the total number and nature and extent of the sales contracts CSI had obtained related to [t]he . . . cemeteries; b) the correct dollar amounts of the sales contracts CSI obtained related to [t]he . . . cemeteries; c) the correct amount of monies, commissions, liabilities due to The Redemptorists; [and] d) the correct amount of perpetual care funds due The Redemptorists."

**COUNT III** claimed **constructive fraud** against **CSI and Coulthard.** It alleged that CSI and Coulthard had breached their fiduciary duty to The Redemptorists by "misrepresenting and failing to disclose a) the total number and nature and extent of the sales contracts CSI had obtained related to [t]he . . . cemeteries; b) the correct dollar amounts of the sales contracts CSI obtained related to [t]he . . . cemeteries; c) the correct amount of monies, commissions, liabilities due to The Redemptorists; and d) by failing to escrow and remit to The Redemptorists those funds due The Redemptorists . . . ; and e) by appropriating corporate funds for the personal use of the stockholders rather than remitting monies owed to The Redemptorists."

**COUNT IV** claimed **fraudulent conveyance** against **all three appellees** (CSI, Coulthard, and Dorman), alleging that, instead of remitting the monies owed to The Redemptorists, a debt of which it was aware, "CSI conveyed substantial assets to . . . Coulthard and Dorman thereby rendering itself unable to pay its liabilities to The Redemptorists."

**COUNT V** claimed **unjust enrichment** against **all three appellees.** It alleged that appellees "improperly withheld monies from The Redemptorists" and that to allow appellees to retain the benefit of this withholding would be "inequitable and unjust[.]"

**COUNT VI,** a **conversion** count against **CSI and Coulthard,** concerned alleged actions by appellees *after* the termination of the contract. It alleged that, even after its contract was terminated, CSI sold "niches" in the mausoleums without notifying The Redemptorists, which already had sold those niches to others.

Each of these counts requested the same $800,000 measure of damages.

Shortly thereafter, on August 22, CSI and Coulthard filed a Petition To Order Arbitration, asserting that the arbitration provision in the contract covered all of The Redemptorists' claims against them. On September 15, The Redemptorists filed a Petition To Stay Arbitration. After a hearing, the circuit court, on May 15, 2001, granted CSI and Coulthard's petition, ordering arbitration of all claims against those defendants. The court also stayed all claims against appellee Dorman until the arbitration was concluded.

We will include, in our discussion below, additional facts as they pertain to specific issues raised in this appeal.

## DISCUSSION

## I.

**The Redemptorists' Appeal Is Properly Before This Court**

Before proceeding to the merits of the appeal, we shall address CSI and Coulthard's contention, made in the form of a motion to dismiss appended to their brief, that this appeal was prematurely filed, and thus is not properly before us.

After the court issued its May 15, 2001 order granting CSI and Coulthard's petition to order arbitration, The Redemptorists filed a motion to alter or amend the judgment on May 25. On June 14, while its revisory motion was still pending, The Redemptorists filed its notice of appeal to this Court. Thereafter, the trial court denied the motion to alter or amend, but entered a more specific order explaining its decision.

The Redemptorists filed its motion to alter or amend the judgment under Md. Rule 2–534.

**Rule 2–534. Motion to alter or amend a judgment—Court decision.**

In an action decided by the [circuit] court, on motion of any party filed within ten days after entry of judgment, the court may open the judgment to receive additional evidence, may amend its findings or its statement of reasons for the decision, may set forth additional findings or reasons, may enter new findings or new reasons, may amend the judgment, or may enter a new judgment.

Md. Rule 8–202 sets forth the timing requirements for noting an appeal from an order or judgment. It provides, in relevant part:

(a) **Generally.** Except as otherwise provided in this Rule or by law, the notice of appeal shall be filed within 30 days after entry of the judgment or order from which the appeal is taken. . . .

(c) **Civil action—Post judgment motions.** In a civil action, when a timely motion is filed pursuant to Rule . . . 2–534, the notice of appeal shall be filed within 30 days after entry of (1) a notice of withdrawing the motion, or (2) an order . . . disposing of the motion pursuant to Rule . . . 2–534. A notice of appeal filed before the withdrawal or disposition of [the motion] . . . does not deprive the trial court of jurisdiction to dispose of the motion.

The Court of Appeals' decision in *Edsall v. Anne Arundel County*, 332 Md. 502, 632 A.2d 763 (1993), directly refutes the claim by CSI and Coulthard that The Redemptorists' appeal here was prematurely filed. In *Edsall*, a final judgment against the Edsalls was entered on February 28. Nine days later, the Edsalls filed a motion to alter or amend the judgment. While their motion was still pending, the Edsalls filed a notice of appeal in this Court under Md. Rule 2–534. Thereafter, the Edsalls' motion to alter or amend the judgment was denied. The Edsalls did not file any subsequent notice of appeal.

In arguing that the appeal should be dismissed, the defendant in *Edsall* asserted that the Edsalls' notice of appeal, filed while their revisory motion was still pending, was "ineffective because the finality of the judgment had been interrupted by the timely filing of the motion to alter or amend the judgment." *Id.* at 503–04, 632 A.2d 763. In answering our certified question regarding whether a notice of appeal filed "prior to the withdrawal or disposition" of a revisory motion is sufficient to constitute a timely appeal, the Court of Appeals explained:

> The notice of appeal, if otherwise effective under the provisions of Rule 8–202(a), will not lose its efficacy because a timely post-judgment motion is filed or is pending, but its effect will be delayed until the trial court rules on the pending motion, or it is withdrawn[.]

*Id.* at 506, 632 A.2d 763.

Similarly, in *Bd. of Liquor License Comm'rs for Baltimore City v. Fells Point Café, Inc.*, 344 Md. 120, 685 A.2d 772 (1996), after the entry of a final judgment, the Board filed several motions to reconsider. It filed a notice of appeal while these motions to reconsider were still pending. Citing its decision in *Edsall*, the Court of Appeals held that the Board's notice of appeal did not lose its effectiveness simply because the Board filed a post-judgment motion. *See id.* at 134, 685 A.2d 772. Therefore, the Board's appeal was held to be timely filed, and properly before the Court. *See id.*

Here, as in *Edsall* and *Fells Point Café*, the filing of a post-judgment motion did not render The Redemptorists' timely notice of appeal ineffective. It merely delayed the **effect** of that notice of appeal until after the resolution of the motion.

CSI and Coulthard argue that this case is distinguishable from both *Edsall* and *Fells Point Café*, because in those cases the denial of the timely filed revisory motion was not by way of a complete memorandum opinion and order which clarified and essentially replaced the prior order. That is, if the trial court's denial of the motion to alter or amend judgment does not alter the character of the prior judgment, there

would be no need to renew an appeal filed prior to disposition of that revisory motion. This did not occur here.

We reject this argument because we see no such limitation in the rule pronounced by the Court of Appeals in both *Edsall* and *Fells Point Café*.[3] The Redemptorists filed a timely notice of appeal from the May 15 final judgment, and its appeal is properly before this Court.

We find the other cases cited by CSI and Coulthard in support of their motion to dismiss to be distinguishable. In *Carr v. Lee*, 135 Md.App. 213, 762 A.2d 142 (2000), *cert. denied*, 363 Md. 206, 768 A.2d 54 (2001), we held that there was no final judgment from which to appeal because the trial court, in ruling orally from the bench, "not only contemplated that a written order would be executed, and expressly indicated that its decision was not final," it also failed to decide all the issues, merely "outlin[ing] its thoughts and conclusions" from the bench. *Id.* at 223, 762 A.2d 142. Unlike *Carr*, here the trial court's May 15 order was a written order, and disposed of all the issues raised in the petition to order arbitration.

*Makovi v. Sherwin–Williams Co.*, 311 Md. 278, 533 A.2d 1303 (1987), is also distinguishable. In *Makovi*, the Court of Appeals held that an order granting the defendant's motion for summary judgment, but giving the plaintiff 30 days to file an amended complaint, was not a final order, and thus an appeal from such an order was premature. *See id.* at 281–83,

---

3. Recently, in *Folk v. State*, 142 Md.App. 590, 791 A.2d 152 (2002), we discussed the effect of the rule laid out in *Edsall* in the context of a criminal case.

 In ruling on [a postjudgment motion after a notice of appeal has been filed], the [trial] court is *not* constrained to limit the exercise of its jurisdiction so as not to interfere with the appeal—just as it would *not* have been so constrained had it ruled on the motion in the ordinary course. If the court denies the motion, th[e] appeal shall then proceed, and the appellant may raise issues challenging the underlying judgments and the denial of the motion. If the court grants the motion, it is the appellant's responsibility to dismiss this appeal.

*Id.* at 602, 791 A.2d 152 (citing *Edsall v. Anne Arundel County*, 332 Md. 502, 508, 632 A.2d 763 (1993)).

533 A.2d 1303. The trial court's order in this case had no such express provision affecting its finality.

Finding this appeal properly before us, we deny CSI and Coulthard's motion to dismiss and move on to address the substantive merits of the appeal.

## II.

### The Trial Court Erred In Granting Coulthard's Petition To Order Arbitration

The Redemptorists argue that the trial court erred in granting appellee Coulthard's petition to order arbitration of the claims against him because Coulthard was not a party to the contract between CSI and The Redemptorists that contained the arbitration provision. Therefore, it asserts, Coulthard has no right to arbitration of the claims against him individually.[4]

"Arbitration is the process whereby parties voluntarily agree to substitute a private tribunal for the public tribunal otherwise available to them." *Gold Coast Mall, Inc. v. Larmar Corp.*, 298 Md. 96, 103, 468 A.2d 91 (1983). Therefore, "[a] party cannot be required to submit any dispute to arbitration that it has not agreed to submit." *Id.*

> "Arbitration is 'consensual; a creature of contract. As such, only those who consent are bound. . . . In the absence of an express arbitration agreement, no party may be compelled to submit to arbitration in contravention of its right to legal process.' An arbitration agreement cannot impose obligations on persons who are not a party to it and do not agree to its terms."

*Hartford Accident & Indemn. Co. v. Scarlett Harbor Assocs. Ltd. P'ship*, 346 Md. 122, 127, 695 A.2d 153 (1997) (citations omitted); *see also Curtis G. Testerman Co. v. Buck*, 340 Md. 569, 579–80, 667 A.2d 649 (1995)(trial court erred in forcing

---

4. These claims include fraud, constructive fraud, fraudulent conveyance, unjust enrichment, and conversion.

president of contracting company to arbitrate homeowners' claims against him individually when he was not party to contract between homeowners and company that contained arbitration provision).

Applying these principles, we hold that the trial court erred in granting Coulthard's petition to compel arbitration of The Redemptorists' claims against him, because there was no agreement between The Redemptorists and Coulthard to arbitrate, only an agreement between The Redemptorists and CSI. In doing so, we reject CSI and Coulthard's contention that, despite the fact that a party cannot be compelled to arbitrate,

> there is nothing *preventing* a party from *joining* in a pending arbitration proceeding as to a claim against that party based on the same facts and circumstances as the claims before the arbiter, *even if that party did not sign the contract.* Since arbitration is a "voluntary" process, there is no impediment to a party "voluntarily" deciding to be part of that process.

Their argument, frankly, misses the point. Coulthard is not merely "voluntarily" consenting to arbitration of the claims against him. He is attempting, by filing a petition to order arbitration, to compel **The Redemptorists,** against its will, to arbitrate claims it never agreed to arbitrate. This action violates the spirit of arbitration, as outlined in the principles laid out above.

The trial court erred in granting Coulthard's petition to order arbitration of The Redemptorists' claims against him. On remand, the court should consider whether a stay of The Redemptorists' claims against Coulthard, pending arbitration with CSI, is appropriate. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 20 n. 23, 103 S.Ct. 927, 939 n. 23, 74 L.Ed.2d 765 (1983)("In some cases, . . . it may be advisable to stay litigation among the nonarbitrating parties pending the outcome of the arbitration. That decision is one left to the [lower] court . . . as a matter of its discretion to control its docket").

## III.

### CSI Did Not Waive Its Contractual Right To Arbitrate

The Redemptorists asserts that the trial court erred in finding that CSI and Coulthard had not waived any right they might have had to arbitrate the claims against them. Because we hold that Coulthard had no contractual right to arbitrate in the first place, we need not decide whether Coulthard waived that right. Therefore, we focus solely on the actions and intentions of CSI.

The Redemptorists puts forth three "circumstances" that it believes support an inference of waiver on the part of CSI: (1) "the un-timeliness and lack of any arbitration filing" by CSI; (2) CSI's filing of a motion to dismiss The Redemptorists' complaint; and (3) the allegation that CSI "continued to conduct business relative to [one of the cemeteries] after July 31, 1999," when The Redemptorists terminated its contract with CSI. CSI disputes this challenge, asserting that there is no evidence to indicate that it "intentionally" relinquished its right to arbitrate, as required under waiver law.

"Because the right to arbitrate is a matter of contract, it is possible for parties to waive that right." *Charles J. Frank, Inc. v. Associated Jewish Charities of Baltimore, Inc.,* 294 Md. 443, 448, 450 A.2d 1304 (1982).

A waiver is the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from the circumstances. "[A]cts relied upon as constituting a waiver of the provisions" of a contract must be inconsistent with an intention to insist upon enforcing such provisions.

*BarGale Indus., Inc. v. Robert Realty Co.,* 275 Md. 638, 643, 343 A.2d 529 (1975). "The intention to waive must be clearly established and will not be inferred from equivocal acts or language." *Charles J. Frank,* 294 Md. at 449, 450 A.2d 1304.

 "Whether or not there has been a waiver of such a right under a contract is generally a question of fact." [5] *BarGale Indus.*, 275 Md. at 644, 343 A.2d 529. We will reverse the factual findings of the trial court only if clearly erroneous. *See RTKL Assocs., Inc. v. Four Villages Ltd. P'ship*, 95 Md.App. 135, 138, 620 A.2d 351, *cert. denied*, 331 Md. 87, 626 A.2d 371 (1993). We review the trial court's finding that CSI did not waive its contractual right to arbitrate under this standard.

The parties, for the most part, cite in support of their respective positions the same cases dealing with waiver of a contractual right to arbitration. Because there is no "bright-line" test for determining waiver, and since the determination of what conduct constitutes an "intentional relinquishment" of one's right to arbitrate is highly factually-dependent, we will review the cases in this area to gain a better sense of the conduct that has been adjudged in the past to effect a waiver. Against this spectrum of cases, we then will compare the three allegations of waiver raised in this case.

### A.

### Background Caselaw Governing Waiver Of A Contractual Right To Arbitrate

 "[O]ne who litigates an issue that otherwise would be subject to arbitration waives his right subsequently to arbitrate that issue." *Stauffer Constr. Co. v. Bd. of Educ. of*

---

5. We explained the effect of a finding of waiver in *Stauffer Constr. Co. v. Bd. of Educ. of Montgomery County*, 54 Md.App. 658, 668, 460 A.2d 609 (1983).

> A finding of waiver ... would mean no more than that the contractual right to compel arbitration had become unenforceable; that right would be regarded as having been voluntarily relinquished and thus treated as though it had never existed. Such a finding would have no bearing, however, upon either the validity or the enforceability of the underlying claims (or the defenses to them). It would mean only that the dispute over the claims would have to be resolved through the judicial process, in which all arguments for and against the claims could be presented as though there never had been an arbitration agreement.

*Montgomery County,* 54 Md.App. 658, 667, 460 A.2d 609 (1983). In *Charles J. Frank,* the Court of Appeals affirmed the trial court's finding that a contractor had waived its right to arbitrate certain claims when it filed a third-party claim against the project owner, the project owner filed an answer on the merits, and a final judgment on an arbitrable matter was obtained, all without any demand for arbitration. *See Charles J. Frank,* 294 Md. at 450, 450 A.2d 1304. The Court held, however, that the waiver was only as to the right to arbitrate the claim litigated, and did not extend to other unrelated issues arising under the contract between the contractor and the owner.

> While ... [participation in a judicial proceeding that resulted in a final judgment on an isolated set of issues] constituted a waiver of the right to arbitrate those issues, it was not necessarily inconsistent with an intention to enforce the right to arbitrate other unrelated issues arising under the same contract with the owner. Such conduct was, therefore, too equivocal, in and of itself, to support an inference that the contractor had waived the right to arbitrate issues other than those raised and decided in the ... [litigation]. There was no other probative evidence to show that the contractor intended to waive the right to arbitrate unrelated issues.

*Id.* at 454–55, 450 A.2d 1304. Therefore, the Court of Appeals reversed the trial court's finding that the waiver extended to contract claims unrelated to the issues litigated. *See id.*

In *Stauffer,* the parties raised the issue of waiver by failure to timely demand arbitration before the circuit court, but the court did not decide the issue. Instead, it overreached its jurisdiction by adjudicating substantive issues as to the validity of the underlying claims themselves, rather than simply the arbitrability of those claims. Therefore, we vacated the trial court's judgment and remanded the case in order for the trial court to make findings as to whether the party requesting arbitration had waived its right to arbitration by not timely demanding it. *See Stauffer,* 54 Md.App. at 672, 460 A.2d 609. Thus, *Stauffer* does not offer us much guidance, because we

did not decide whether waiver had occurred under the circumstances of that case.

In *RTKL Assocs.*, we affirmed the trial court's finding that a party who waited five years before demanding arbitration had waived its right to do so. That party, however, in the meantime, had engaged itself in the litigation by filing cross-claims and participating in depositions and other discovery, thereby exhibiting behavior inconsistent with the intention to arbitrate. *See RTKL Assocs.*, 95 Md.App. at 144–45, 620 A.2d 351.

*Gold Coast Mall* involved a similar "waiver by failure to request arbitration" argument made by a landlord against a tenant. There, the arbitration provision stated that "in the event of disagreement between the parties ... which they are unable to resolve within sixty days ... such disagreement shall be submitted ... to ... arbitration[.]" *Gold Coast Mall*, 298 Md. at 101–02, 468 A.2d 91. It further provided that "within fifteen (15) days after the 60–day negotiation time" each party "shall appoint one arbitrator" to sit on a three-arbitrator panel charged with resolving the dispute.

The trial court found that the tenant had waived his right to arbitrate by not initiating arbitration within fifteen days of the expiration of the sixty-day negotiation period. Reversing this Court, the Court of Appeals held that the trial court's waiver finding was clearly erroneous.

We are persuaded that a party against whom a claim is asserted, and who is not therefore seeking relief, does not have an obligation to initiate arbitration.... Because the landlord was asserting a claim, it was the landlord's and not the tenant's initial obligation to initiate arbitration. The landlord, however, did not initiate arbitration. Rather, it sought relief by asserting its claim in the trial court. This action by the landlord constituted a refusal to arbitrate.

In the trial court the tenant did not file an answer on the merits. Rather, it filed a motion raising preliminary objection on the ground that the agreement required arbitration of the ... dispute and filed a petition to compel arbitration.

Under these circumstances, the tenant did not engage in any conduct inconsistent with an intention to insist upon enforcing the right to arbitrate. Accordingly, the tenant did not waive the right to arbitrate the . . . dispute.

*Id.* at 113–15, 468 A.2d 91.

In addition to the cases above, cited by both The Redemptorists and CSI, CSI cites two additional cases for our consideration.[6] *Horsey v. Horsey,* 329 Md. 392, 620 A.2d 305 (1993), concerned a separation agreement. This agreement provided for arbitration of any dispute as to "the matter of any reduction or subsequent increase in alimony payments[.]" *Id.* at 395, 620 A.2d 305. Because both parties filed pleadings in the circuit court, stated through their attorneys at trial that the arbitration clause in the contract had been waived, and had never requested arbitration, the Court of Appeals held that the parties had "unequivocally waived their contractual right to arbitration as a means for resolving their dispute" by failing to request arbitration at any time during the court proceedings and engaging in actions " 'inconsistent with an intention to insist upon enforcing' their right to arbitrate." *Id.* at 407, 620 A.2d 305. Therefore, the Court of Appeals reversed the trial court's order to arbitrate the parties' dispute. *See id.* at 406, 620 A.2d 305.

Similarly, in *NSC Contractors, Inc. v. Borders,* 317 Md. 394, 564 A.2d 408 (1989), the Court of Appeals affirmed the trial court's finding that the parties had waived their right to arbitrate the claim because neither party had demanded arbitration at trial, and one party "stated in the petition for a writ of certiorari that the parties voluntarily waived their right to arbitration," and the other party did not refute this claim. *See id.* at 402, 564 A.2d 408.

With this authority in mind, we turn now to the three "circumstances" alleged by The Redemptorists to constitute waiver of CSI's contractual right to arbitrate the claims against it.

---

**6.** CSI cites these additional cases for purposes of distinguishing them.

## B.

### Specific Allegations Of Waiver In This Case

#### 1.

### Timeliness Of Arbitration Filing

The Redemptorists first argue that, by failing to "file a claim in arbitration disputing the 'cause' of [its] termination" in the "approximately 2½ years" since the contract was terminated, CSI has waived any right it might have had to arbitrate the claims against it.

The timeliness of a claim to arbitrate is a proper issue for the court, not the arbitrator, insofar as it "requires a determination of whether an agreement to arbitrate still exists based on possible waiver[.]" *See Rosecroft Trotting & Pacing Ass'n, Inc. v. Electronic Race Patrol, Inc.*, 69 Md.App. 405, 413, 518 A.2d 137 (1986). In light of the authorities cited, we do not believe that the delay in demanding arbitration constituted an intentional relinquishment by CSI of its right to arbitrate the claims against it. Neither party cites a case that concerned a circumstance in which a court found waiver due *solely* to delay. In all of the waiver cases, the party seeking to enforce its right to arbitrate had engaged itself substantially in the judicial forum, by at least filing an answer to the complaint against it. The facts of this case are not so definitive.

Furthermore, the major portion of the six months between the filing of the initial complaint and the filing of the petition to order arbitration was spent clarifying the scope of the complaint. Significantly, less than a month passed between The Redemptorists' July 17, 2000 filing of its first amended complaint, which was significantly more specific than the initial complaint and added five additional claims, and CSI's August 22 filing of its petition to order arbitration. Waiting for a more specific statement of the claims against it, in order to determine whether those claims fell within the scope of the arbitration provision in the contract, is not inconsistent with enforcing that right to arbitrate once the full scope of the

claims became known. The delay in demanding arbitration was understandable under the circumstances, and did not constitute waiver of any right CSI might have to arbitrate the claims against it. The trial court was not clearly erroneous in finding that CSI had not waived its contractual right to arbitrate through its delay in requesting arbitration.

### 2.

### Participation In Litigation

The Redemptorists also assert that CSI waived its right to arbitrate the claims against it by filing a motion to dismiss The Redemptorists' complaint, and participating in other ways in the litigation. According to The Redemptorists, CSI attempted to "draw out" the proceedings by engaging in "procedural posturing." It also claims that CSI engaged in other actions consistent with waiver, such as "attach[ing] a certification document to its [motion to dismiss] outside the four corners of the complaint, thereby transforming the motion [in]to a motion for summary judgment," and asking in its proposed order on the motion that "the case be dismissed with prejudice."

Here, unlike in *Charles J. Frank*, CSI did not engage wholeheartedly in the judicial forum. CSI filed a motion to dismiss The Redemptorists' initial complaint for lack of jurisdiction on June 22, 2000. In that motion, CSI alleged that The Redemptorists was a foreign corporation, and had failed to "qualify" with the State Department of Assessments and Taxation ("SDAT") under Maryland Code (1975, 1999 Repl. Vol.), section 7–203 of the Corporations and Associations Article, by certifying to SDAT its business address and the name and address of its resident agent in Maryland, and, as such, was barred from bringing suit in Maryland courts. It attached a certified statement from an SDAT official verifying that "there is no record of a foreign or domestic corporation by the name of The Redemptorist Fathers." As it turned out, the corporation was registered in Maryland as simply "The Redemptorists," rather than "The Redemptorist Fathers," as

stated in the initial complaint. Nevertheless, according to The Redemptorists, the act of attaching this certification to its motion to dismiss for lack of jurisdiction transformed that motion into a motion for summary judgment and, as such, catapulted CSI into the judicial forum, resulting in waiver of any right to arbitrate the claims against it.

Significantly, however, the substantive merit of this motion was never addressed, because it became moot after The Redemptorists filed their first amended complaint, this time identifying itself more accurately as "The Redemptorist[s] . . . also paternally referred to from time to time as The Redemptorist Fathers[.]"

We do not consider the act of filing a motion to dismiss on a jurisdictional ground to be an unequivocal demonstration by CSI that it intended to waive its right to arbitrate the claims against it, and to participate instead in a judicial forum. CSI's motion did not address the merits of the claims in the initial complaint. It was limited to what it perceived as a procedural flaw in the complaint that, if meritorious, could have disposed of the court's jurisdiction to consider the complaint. It was not a case, as in *Charles J. Frank*, for example, in which the party participated in full-fledged litigation of an arbitrable claim, resulting in a final disposition by a judicial officer. The facts of this case are also distinguishable from *RTKL Assocs.*, in which the party seeking to enforce its right to arbitration previously had filed an answer to the complaint against it, as well as cross-claims and other pleadings addressing substantive issues. The trial court was not clearly erroneous in concluding that CSI's limited participation in the judicial forum did not constitute a waiver of its right to arbitrate the claims against it.

### 3.

### Alleged Failure To Stop All Activities Under The Contract Upon Contract Termination

The Redemptorists' final argument for waiver is that "despite The Redemptorists' terminat[ion of] the [c]ontract,

CSI continued to conduct business relative to" one of The Redemptorists' cemeteries. Additionally, the Redemptorists argue that CSI should be "estopped from challenging the very discharge which [it] ignored."

There is a dispute between the parties as to whether CSI actually continued to conduct business concerning The Redemptorists' cemeteries after the termination of its contract in July 1999. Because of the limited scope of our review in arbitration matters, *see Rosecroft Trotting,* 69 Md.App. at 409, 518 A.2d 137, we will not decide whether such conduct actually occurred. Rather, we hold that, even assuming that CSI continued operating under the contract after its termination, such conduct was not consistent with an intentional relinquishment of its contractual right to arbitrate, and thus would not constitute waiver. To the contrary, it may be viewed as a continued challenge to the propriety of that termination.

## VI.

### The Trial Court's Determination That All Claims Against CSI Were Arbitrable Was Overly Broad

The Redemptorists also assert error in the trial court's interpretation of the arbitration provision to encompass all of its claims against CSI and Coulthard, leading to its decision to grant CSI and Coulthard's petition to order arbitration. As with the waiver issue, because we hold that Coulthard has no contractual right to arbitration in the first place, our discussion of this issue pertains only to the court's decision to grant CSI's petition to order arbitration.

As we explained earlier, arbitration is a matter of contract. *See Charles J. Frank,* 294 Md. at 448, 450 A.2d 1304. Therefore, ordinary principles of contract interpretation apply in construing the meaning and scope of an arbitration provision.

In determining the meaning of contractual language, Maryland courts have long adhered to the principle of the objective interpretation of contracts. Under the objective interpretation principle, where the language employed in a

contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court. "If a written contract is susceptible of a clear, unambiguous and definite understanding ... its construction is for the court to determine."

Further, "[t]he clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or was intended to mean." The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.

*Wells v. Chevy Chase Bank, F.S.B.,* 363 Md. 232, 250–51, 768 A.2d 620 (2001) (citations omitted); *see NRT Mid–Atlantic, Inc. v. Innovative Props., Inc.,* 144 Md.App. 263, 284, 797 A.2d 824, 836 (2002)("Just because parties disagree about the meaning of the words in a written agreement does not mean that [those words] are ambiguous"). Questions concerning interpretation of a contract are ordinarily questions of law, and are reviewed *de novo. See Calomiris v. Woods,* 353 Md. 425, 434, 727 A.2d 358 (1999).

## A.

### Cases Cited By The Parties

The Redemptorists asserts that the arbitration provision in its contract with CSI is narrowly drafted, and does not apply to its claims against CSI. It cites three cases in which courts have construed arbitration provisions more narrowly-crafted than a broad "catch-all" clause covering all claims and disputes: *Wells v. Chevy Chase Bank,* 363 Md. 232, 768 A.2d 620 (2001); *Gelco Corp. v. Baker Indus., Inc.,* 779 F.2d 26 (8th Cir.1985); and *Coady v. Ashcraft & Gerel,* 996 F.Supp. 95 (D.Mass.1998).

In *Wells,* a credit card holder sued the issuing bank, alleging breach of an open end credit agreement by, among other things, charging excessive interest, and changing the amount of the late fee and the formula for determining the finance charge without notice to cardholders. The agreement between the parties included an alternative dispute resolution

("ADR") section that provided: "any controversy or claim ... between or among you and us ... shall, *at the request* and expense *of the claiming party,* be submitted to mediation[.]" *Wells,* 363 Md. at 236, 768 A.2d 620. If the dispute could not be resolved through mediation "within 30 days from the date of engagement," then it would be submitted to binding arbitration.

The bank sought to compel arbitration, and the trial court granted its request. The Court of Appeals reversed, holding that under the ADR provision in the agreement, the defending party could not force the claiming party to mediate or arbitrate the claims. *See id.* at 251–52, 768 A.2d 620. "Ordering the claiming party to mediate and, 'if mediation fails' to arbitrate, when the claiming party has not requested mediation does not compel compliance with the mediation and arbitration clause provisions; rather, an order so compelling exceeds those provisions." *Id.*

*Gelco* involved the interpretation of a narrow arbitration provision covering disputes regarding the accuracy of Gelco's closing financial statements under a contract between Gelco and Baker under which Baker was to purchase capital stock from Gelco. Because the arbitration provision was narrowly drafted, the Eighth Circuit held that it did not cover Baker's state court claims against Gelco for breach of contract. *See Gelco,* 779 F.2d at 28. The court commented:

> When an agreement to arbitrate is broadly drafted, arbitration should be granted "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." **However, when presented with a narrowly drawn commercial arbitration clause, the court should consider whether the conduct in issue is on its face within the scope of that clause. "Hence, if the arbitration agreement cannot reasonably be construed to cover [a particular] dispute ..., arbitration need not be compelled."**

*Id.* (emphasis added and citations omitted).

Finally, in *Coady,* the managing attorney of a law firm's Boston office, Edward Coady, wrote a letter to the firm

alleging breach of his employment contract by (1) withholding compensation, (2) withholding annual and semi-annual earning statements for the Boston office, (3) hiring a relative of a partner for the Boston office without Coady's approval, and (4) threatening to terminate Coady's employment if he exercised his right to seek arbitration of this employment dispute. The parties negotiated, but could not reach a resolution. The firm filed suit against Coady, alleging breach of contract, conversion, and breach of fiduciary duty. It also sought a declaration of enforceability regarding a "prenuptial" agreement (concerning procedures for voluntary or involuntary termination of Coady), and a declaration of termination with cause under the employment agreement, and an accounting. Coady requested arbitration of the firm's claims against him.

The employment agreement included an arbitration provision. Under that provision,

> any ambiguities or questions of interpretation of this contract shall be the subject of discussions by Coady and [a firm representative] .... Either party may at this [sic] option elect to submit the matter to Binding arbitration ...; however, both parties agree to use reasonable means and good faith to attempt to resolve any differences that may arise prior to resorting to arbitration.

*Coady,* 996 F.Supp. at 98. The arbitration provision appeared in the "Financial" section of the employment agreement.

The federal district court summarized the law governing arbitrability of disputes.

> Arbitration agreements are to be construed according to the general rules governing the interpretation of contracts, taking into account the intention of the parties and the strong public policy in favor of arbitration. Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.

*Id.* at 107 (quotation marks and citations omitted).

The court held that the arbitration provision in the employment agreement applied to disputes "(1) requiring clarification

of the meaning of a particular contractual provision because the language of the contract suggests more than one reasonable interpretation (ambiguities) and (2) requiring construction of the substantive provisions of the contract." *Id.* It further explained that, because the arbitration clause was contained within the Financial section of the contract, but its language referred to arbitration of "any ambiguities ... **in this contract**," the clause was ambiguous as to whether disputes other than financial disputes were arbitrable. *See id.* (emphasis added). Thus, the court held that "whether the arbitration clause applies to issues other than those encompassed in the Financial section" was itself a proper issue for arbitration. *See id.*

Specifically, the district court held that (1) the firm's breach of contract claim was arbitrable because it required interpretation of the contract to "ascertain Coady's exact duties, obligations, and responsibilities" in order to decide the claim; (2) Coady's breach of contract claim was partially arbitrable;[7] (3) the firm's conversion claim was arbitrable because "whether the control exercised by Coady was outside of the scope of the authorized use of the company credit card requires determining the scope of authorized use," which requires contract interpretation; (4) the firm's breach of fiduciary duty claim was non-arbitrable because a fiduciary relationship arises out of agency law, and does not require interpretation of the employment contract; (5) the firm's claim that the "prenuptial" agreement was valid and enforceable was non-arbitrable because it did not require interpretation of contract language; it was merely a question about whether such a contract existed. *See id.* at 108–10.

In response, CSI cites a string of cases. In *NSC Contractors,* 317 Md. 394, 564 A.2d 408 (1989), the Court of Appeals construed an arbitration provision in a construction contract

---

7. Because Coady's role in the hiring of Boston personnel was a question of contract interpretation "as to the scope of Coady's role," it was deemed arbitrable. All other breach allegations were deemed non-arbitrable because they did not involve any interpretation of the employment agreement to be resolved.

that excluded from arbitration "[t]he architect's decisions in matters relating to artistic effect," to encompass a dispute over the architect's decision to withhold final certification of payment under the contract. *See id.* at 403, 564 A.2d 408. The Court held that, because such a decision "was an economic decision, and not purely artistic[,] . . . [t]he dispute arising out of this decision is . . . reviewable under the broad arbitration provisions [in the contract]." *Id.* The Court quoted our decision in *Rosecroft Trotting,* which favored a broad, rather than a narrow interpretation of an arbitration provision " '[i]n light of the well recognized preference to enforce fully executory agreements to arbitrate[.]' " *Id.*

In *Gold Coast Mall,* the Court of Appeals explained that the reviewing court should defer to the arbitrator in close cases, when it is unclear whether a particular issue is arbitrable under the contractual arbitration provision.

> [W]hen the language of an arbitration clause is unclear as to whether the subject matter of the dispute falls within the scope of the arbitration agreement, the legislative policy in favor of the enforcement of agreements to arbitrate dictates that ordinarily the question of substantive arbitrability initially should be left to the decision of the arbitrator. Whether the party seeking arbitration is right or wrong is a question of contract application and interpretation for the arbitrator, not the court, and the court should not deprive the party seeking arbitration of the arbitrator's skilled judgment by attempting to resolve the ambiguity.

*Gold Coast Mall,* 298 Md. at 107, 468 A.2d 91.

*State Farm Mut. Auto. Ins. Co. v. Coviello,* 233 F.3d 710 (3d Cir.2000), concerned the arbitrability of a dispute regarding coverage under an auto insurance policy. The dispute centered on whether a policy exclusion applied. The arbitration provision at issue provided:

> Two questions must be decided by agreement between the insured and us:

(1) Is the insured legally entitled to collect compensatory damages from the owner or driver of an uninsured motor vehicle or underinsured motor vehicle; and

(2) If so, in what amount?

If there is no agreement, these two questions shall be decided by arbitration at the request of the insured or us. The arbitrator's decision shall be limited to these two questions.

*Id.* at 717. The Third Circuit, in reversing the trial court, held that, under the plain language of the policy, arbitration was not "triggered" unless there is a disagreement involving Question (1), the insured's legal entitlement to collect compensatory damages, or (2), the amount of damages. *See id.* The court found significant the fact that the arbitration provision was found under a section of the policy entitled "Deciding Fault and Amount." *See id.* Thus, the court held, because the dispute centered on whether a policy exclusion applied, rather than the legal entitlement of Coviello to compensatory damages, the issue was not within the scope of the arbitration provision, and was non-arbitrable. *See id.* at 718.

Although the cases cited by the parties provide helpful applications of the policies underlying arbitration, none involve a clause similar either in substance or in scope to the one at issue in this case. What they collectively make clear, however, is that the scope and application of an arbitration clause must be decided on a case-by-case basis, with close attention paid to crafting a resolution that respects the policies underlying arbitration of disputes.

### B.

### Interpretation Of The Arbitration Clause At Issue

In determining the scope of an arbitration provision, a court must consider two competing aims. A court must resolve any doubts concerning the scope of arbitrable issues in favor of arbitration, reflecting a strong public policy in favor of arbitration. In doing so, however, the contract nature of arbitration must be respected, so as not to require a party to

submit a dispute to arbitration that it has not agreed to arbitrate. *See Charles J. Frank*, 294 Md. at 457–58, 450 A.2d 1304. In short, "as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985).

Here, the plain language of the arbitration provision indicates that the parties agreed only to arbitrate disputes as to the "cause for termination." Like the *Coviello* and *Coady* Courts, we find the placement of the arbitration provision under the "Grounds For Termination" section persuasive in indicating the limited nature of that provision. Unlike *Coady*, however, where the placement of the arbitration clause under the "Financial" section of the contract made the language of that clause ambiguous, here, placement of the arbitration clause under the "Grounds for Termination" section of the contract confirms the plain language interpretation of that clause. Although the other claims overlap with the "cause for termination," to expand the scope of the clause beyond the issue of "cause" would be contrary to the parties' intent expressed in the contract.

Our examination of the law in this area convinces us that the legislature, in adopting Maryland's version of the Uniform Arbitration Act, anticipated that there may be non-arbitrable issues that are closely related to, and indeed dependent upon, arbitrable issues. Maryland Code (1974, 1998 Repl.Vol.), section 3–209(a) of the Courts & Judicial Proceedings Article ("CJ") provides that "[a] court shall stay any action or proceeding **involving an issue subject to arbitration.**" "If the issue subject to arbitration is severable, the court may order the stay [of litigation] with respect to this issue only." CJ § 3–209(b).

"Whether a claim falls within the scope of an arbitration agreement turns on the factual allegations encompassed in the . . . complaint . . . rather than the legal causes of action asserted therein." Thomas H. Oehmke, *Commercial Arbitra-*

*tion* § 14:08 (1998). Only with a careful examination of each individual claim, and the specific factual allegations upon which those claims are based, can we reach a result that both respects the narrow scope of the parties' agreement to arbitrate, and recognizes the strong public policy in favor of arbitration. Thus, we dissect each claim into its arbitrable and non-arbitrable components below, and discuss the proper procedural disposition of each in this delicate dance between the arbitral and judicial forums.

We begin by noting that each of the six claims asserted by The Redemptorists in its amended complaint is linked to the ground or "cause" for CSI's termination, namely its alleged withholding of monies owed to The Redemptorists under the terms of the contract. This does not mean, however, that each claim is arbitrable *in toto,* but, rather, that each claim may contain an arbitrable **issue,** or component. We illustrate this critical distinction through our discussion below of each individual claim.

Count I, for breach of contract, alleges that CSI withheld funds due The Redemptorists under the contract terms. This claim is arbitrable because The Redemptorists terminated its contract with CSI based on an alleged breach of contract by CSI, *i.e.,* the withholding of funds due The Redemptorists under the contract. The scope of the arbitration, however, is limited to the issue of whether there was a material breach of contract that would justify The Redemptorists' termination of CSI's contract, and does not include a determination of the amount of damages, if any, due to The Redemptorists. The breach of contract claim should be stayed in the circuit court, pursuant to CJ section 3–209, pending arbitration of this issue. Should the arbitrator decide that there was a material withholding of funds, that decision will be binding on CSI in the later litigation of the specific amount of damages due to The Redemptorists. *See Parr Constr. Co. v. Pomer,* 217 Md. 539, 544, 144 A.2d 69 (1958)(" 'If a claim is submitted to arbitration and an award is duly made by the arbitrators, its terms are conclusive on the par-

ties' ")(quoting 6 Williston, *Contracts* (Rev. Ed.) 1927, at 5387–88); *James L. Saphier Agency, Inc. v. Green*, 190 F.Supp. 713, 725–26 (S.D.N.Y.), *aff'd*, 293 F.2d 769 (2d Cir.1961)(arbitrator's finding that actor owed no further commissions to agent under employment contract held to be res judicata on subsequent litigation claiming breach of contract, fraud and unjust enrichment); Martin Domke, *Domke On Commercial Arbitration* § 31:02, at 452 (2d ed. 1984)("Once a binding [arbitration] award has been rendered, issues settled by the award are no longer subject to future arbitration or litigation").

 Counts II and III, for fraud and constructive fraud, allege that CSI misrepresented the amount of money it owed The Redemptorists, failed to remit the correct amount of money, and "appropriate[ed] corporate funds for the personal use of the stockholders" rather than remitting the full amount owed to The Redemptorists. In order to recover damages in a tort action for fraud, a plaintiff must prove,

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.[8]

*Nails v. S & R, Inc.*, 334 Md. 398, 415, 639 A.2d 660 (1994).

The fraud counts are not arbitrable because fraud was not the direct "cause" for termination. Rather, CSI's contract was terminated under paragraph 13.a. of the contract due to CSI's alleged "refusal to perform its duties" under the contract. Nevertheless, it is clear that the fraud claims depend

---

8. In contrast, constructive fraud is " 'a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud.' " *Scheve v. McPherson*, 44 Md.App. 398, 406, 408 A.2d 1071 (1979) (citation omitted).

for their resolution on an arbitrable **issue,** namely, whether there was a withholding of monies owed, irrespective of intent. *See NRT Mid–Atlantic,* 144 Md.App. at 287, 797 A.2d at 838 (intentional interference with business relations, unjust enrichment, and civil conspiracy claims "depend[ed] on the resolution of" arbitrable contract dispute). If CSI did not owe The Redemptorists additional money under the contract, then its representation that nothing was owed was not a **mis-**representation. Because the arbitrator's determination would be binding on The Redemptorists in the future litigation, The Redemptorists' fraud and constructive fraud claims against CSI would fail. *See Parr Constr.,* 217 Md. at 544, 144 A.2d 69; *James L. Saphier Agency,* 190 F.Supp. at 725–26; *Domke, supra,* § 31.02, at 452. As a consequence, even though the fraud claims themselves are not arbitrable, litigation of these claims must be stayed pending resolution of the arbitrable issue upon which they depend. *See* CJ § 3–209.

Count IV, for fraudulent conveyance, asserts that, instead of remitting the proper funds to The Redemptorists, CSI transferred funds to Coulthard and Dorman, "rendering itself unable to pay" The Redemptorists. Maryland Code (1975, 2000 Repl.Vol.), section 15–207 of the Commercial Law Article defines a fraudulent conveyance as "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors[.]" The Redemptorists' fraudulent conveyance claim is dependent upon the arbitrable issue of whether there was a material withholding of funds, and is not severable therefrom. Without a finding that CSI owed The Redemptorists additional funds under the contract, The Redemptorists' fraudulent conveyance claim would fail due to a lack of proof that, among other things, it is a "creditor" of CSI. Because the arbitrable issue cannot be severed from the fraudulent conveyance claim, this claim must be stayed in the circuit court pending arbitration. *See* CJ § 3–209.

■■■ Count V, for unjust enrichment, asserts that it would be "inequitable and unjust" for CSI to keep the funds that it "improperly withheld" from appellant. To recover under a theory of unjust enrichment, a plaintiff must prove three elements: "1. A benefit conferred upon the defendant by the plaintiff; 2. An appreciation or knowledge by the defendant of the benefit; and 3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Berry & Gould v. Berry,* 360 Md. 142, 151, 757 A.2d 108 (2000)(quotation marks and citations omitted). Again, if the arbitrator determines that there was no withholding of funds by CSI, The Redemptorists' unjust enrichment claim will fail because The Redemptorists will be unable to prove the existence of any unjustly retained "benefit." The arbitrable issue is thus not severable from the unjust enrichment claim. Accordingly, that claim also must be stayed in the circuit court pending arbitration. *See* CJ § 3–209.

■■■ The final count in The Redemptorists' complaint alleges conversion. "A 'conversion' is any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." *Interstate Ins. Co. v. Logan,* 205 Md. 583, 588–89, 109 A.2d 904 (1954). At first blush, the factual allegations in the complaint seem to indicate that, because it concerns CSI's actions *after* the termination of the contract, the conversion count does not contain any arbitrable components. A closer examination, however, reveals that this count is just as dependent as the rest on the resolution of the arbitrable issue of whether there was any withholding sufficient to justify termination of the contract. This is because, if there was no material withholding of funds by CSI, The Redemptorists' termination of the contract was unjustified, and CSI's continued operation under that contract would not constitute conversion. On the other hand, if the arbitrator concludes that a material withholding **did** occur, termination of the contract would be justified, and The Redemptorists could put on fur-

ther proof in the later litigation to support its conversion claim. The conversion claim against CSI, therefore, must also be stayed, under CJ section 3–209, pending arbitration of the "cause" issue.

In summary, the arbitrable issue, namely the alleged withholding of funds representing the "cause for termination," is at the heart of each of the six counts featured in The Redemptorists' complaint against CSI, such that it cannot be severed from them. *See* CJ § 3–209(b). Thus, the proper course, we believe, is to (1) order that the issue of whether there was a material breach of contract by CSI sufficient to justify termination of the contract proceed to arbitration; and (2) stay all six counts of The Redemptorists' suit against CSI in the Circuit Court for Baltimore County until resolution of the arbitrable issue.[9] Should the arbitrator conclude that there was no material withholding of funds, this finding would be binding on the parties to the arbitration in the litigation of all six counts, so that there would be no need to litigate them. This resolution respects the limits of the parties' agreement to arbitrate, while recognizing the strong public policy in favor of arbitration.

The binding or preclusive effect of the arbitration decision on Dorman and Coulthard, who will not be parties to the arbitration, but who are parties to the litigation, deserves further mention. In *Holmes v. Coverall N. Am., Inc.*, 336 Md. 534, 649 A.2d 365 (1994), the Court of Appeals addressed the

---

9. We harbor some concern that staying the litigation pending arbitration could place The Redemptorists in a vulnerable position if CSI took the opportunity during that stay to transfer its assets outside· the corporation in order to render itself judgment-proof in the later litigation. To guard against this potential scenario, The Redemptorists may present evidence to the trial court, on remand, that a preliminary injunction is warranted. "[A] court can, and should, grant a preliminary injunction in an arbitrable dispute whenever an injunction is necessary to preserve the status quo pending arbitration." *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 47 (1st Cir.1986). The fact that a court orders arbitration of a dispute does not "absolve [it] of its obligation to consider the merits of a requested preliminary injunction[.]" *Roso–Lino Bev. Distribs., Inc. v. Coca–Cola Bottling Co. of New York*, 749 F.2d 124, 125 (2d Cir.1984).

petitioners' argument that arbitration of their claims would not be appropriate because those claims were against some defendants who would be parties to the arbitration, and some who would not. In doing so, it commented on the effect of an arbitration decision on claims against defendants who were not parties to the arbitration.

> [T]he involvement in this dispute of persons who would not be parties to arbitration does not preclude the enforcement of the arbitration agreement voluntarily entered into by Holmes, Holmestar, and Coverall.... "[I]f arbitration defenses could be foreclosed simply by adding as a defendant a person not a party to an arbitration agreement, the utility of such agreements would be seriously compromised." ...
> **In the instant case, an arbitration decision may ultimately foreclose petitioners' claims against the remaining parties. The decision may also serve to clarify and narrow the issues in a subsequent action in court.**

*Id.* at 552, 649 A.2d 365 (emphasis added).

■ In this case, too, arbitration of the "cause" issue between The Redemptorists and CSI may "ultimately foreclose" The Redemptorists' claims against Coulthard and Dorman. *See id.* The arbitration decision is not technically binding on any parties other than those that participate in the arbitration proceeding. A decision against The Redemptorists in arbitration, however, would effectively bar any recovery by it under the various tort theories alleged in the complaint against not only CSI, but also Coulthard and Dorman, individually. If there was no material withholding of funds by CSI, there is nothing to support The Redemptorists' theories against its officers, Coulthard and Dorman.[10] *See NRT Mid–*

---

**10.** Although we do not decide the issue, it may be that, as CSI officers, Coulthard and Dorman are parties in privity with CSI. "If in a subsequent litigation a nonparty to the arbitration was in privity with the party to the arbitration, then *res judicata* may be asserted." *Res Judicata In Arbitration*, Lawyers' Arbitration Letter (American Arbitration Assoc., New York, N.Y.), Vol. 3, no. 27, Sept. 1979, at 219; *see Shire Realty Corp. v. Schorr*, 55 A.D.2d 356, 390 N.Y.S.2d 622, 625–27 (1977).

*Atlantic,* 144 Md.App. at 288, 797 A.2d at 838 (arbitration of contractual issue may effectively dispose of tort claims against defendants not involved in arbitration "because how the arbitration is resolved will have an impact on whether [the plaintiff] will have evidence sufficient to make out *prima facie* cases in its tort claims").

## V.

### The Stay Of Claims Against Dorman Is Not Reviewable

The Redemptorists also challenges the court's staying of its action against Dorman until the conclusion of the arbitration. The Redemptorists, citing *Charles J. Frank,* 294 Md. 443, 450 A.2d 1304, and CJ section 3–209(b), asserts that "Maryland law allows for, in fact contemplates[,] multiple actions in cases of limited arbitration provisions, or wherein not all parties fall under the arbitration provision." It also argues that because "the [c]ontract does not proscribe [sic] a scenario of separate proceedings ongoing simultaneously on two separate tracks—arbitration and court[,]" there is no "need or justification" for staying the proceedings as to parties not subject to the arbitration provision, *i.e.,* Dorman.[11]

Dorman responds that The Redemptorists cannot challenge the stay before this Court because the trial court's stay order did not "constitute a final judgment or an otherwise appealable interlocutory order sufficient to confer appellate jurisdiction at this time[.]" We agree.

CJ section 12–301 provides that "a party may appeal from a final judgment entered in a civil . . . case by a circuit court. The right of appeal exists from a final judgment entered by a court in the exercise of original, special, limited, statutory jurisdiction, unless in a particular case the right of appeal is expressly denied by law." A "final judgment" is defined by the legislature as "a judgment, decree, sentence, order, deter-

---

11. We note that, pursuant to our decision in part II above, Coulthard also falls into the category of "parties not subject to the arbitration provision."

mination, decision, or other action by a court, ... from which an appeal ... may be taken." CJ § 12–101(f).

"Where a judgment is not so final as to either preclude a party from fully defending his interests in the pending law suit or conclude the question of liability, the judgment is considered interlocutory and normally nonappealable unless it falls within those exceptions specifically enumerated in [CJ section 12–303]." *Breuer v. Flynn,* 64 Md.App. 409, 414, 496 A.2d 695 (1985). An order staying litigation pending arbitration merely postpones the litigation and does not deprive the parties of the right to fully defend their interests at a later time. Therefore, an order staying litigation pending arbitration is not a final judgment, but instead, an interlocutory order. *See, e.g., Browne v. Bear, Stearns & Co.,* 766 S.W.2d 823 (Tex.Ct.App.1989)(litigation stay pending arbitration not a "final judgment" and therefore nonappealable). As such, it is not immediately appealable unless such an order is specifically mentioned in CJ section 12–303, which provides for an appeal for certain otherwise nonappealable interlocutory orders. *See Cant v. Bartlett,* 292 Md. 611, 615, 440 A.2d 388 (1982)(only interlocutory orders mentioned in CJ section 12–303 are immediately appealable).

CJ section 12–303(3)(ix) specifically provides for an appeal from "[a]n order ... [g]ranting a petition to stay **arbitration** pursuant to § 3–208," but does not mention orders granting a stay of **litigation** pending arbitration. Accordingly, we infer that the legislature did not intend for such interlocutory orders to be appealable. *See id.*

Although the stay order is not properly before us as a final judgment, or an appealable interlocutory order under CJ section 12–303, we may still review such an order if it meets the requirements of the so-called "collateral order doctrine." The collateral order doctrine permits an appeal from an otherwise nonappealable order that meets four requirements. The order must "conclusively determine the disputed question," "resolve an important issue," be "completely separate from the merits of the action," and "be effectively unreview-

able on appeal from a final judgment." *Peat, Marwick, Mitchell & Co. v. The Los Angeles Rams Football Co.*, 284 Md. 86, 92, 394 A.2d 801 (1978).

The order at issue does not satisfy even the first criterion of the "collateral order doctrine." The stay order, in and of itself, does not "conclusively determine a disputed issue." It merely delays a final determination of the claims against Dorman until the conclusion of the arbitration proceedings. Finding the appeal from the stay order not properly before us, we decline to address whether the trial court abused its discretion in granting the stay as to Dorman.

The Redemptorists' reliance on *Charles J. Frank's* statement that the arbitration statute contemplates multiple proceedings with possibly inconsistent results is misplaced. In that case, the Court was considering a situation in which the lower court had stayed arbitration of arbitrable claims to await the results of litigation. *See Charles J. Frank*, 294 Md. at 447, 450 A.2d 1304. The Court held that this scenario did not respect either the public policy in favor of arbitration, or the parties' contractual agreement to arbitrate the arbitrable issues. *See id.* at 459–60, 450 A.2d 1304.

This rationale does not apply to a stay of **litigation** pending arbitration because there is no public policy favoring litigation over arbitration. In this circumstance, the parties' agreement to arbitrate a certain class of claims is respected, while the non-arbitrable issues related to those arbitrable claims are stayed temporarily, in order to be decided after the arbitration.

**JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.**

**CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID ½ BY CSI AND COULTHARD AND ½ BY THE REDEMPTORISTS.**